Filed 9/12/25  P. v. Waller CA3
Opinion following transfer from Supreme Court

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| THE PEOPLE, | C093431 |
| | |
| Plaintiff and Respondent, | (Super. Ct. No. 18FE018342) |
| | |
| v. | OPINION ON TRANSFER |
| | |
| ROY CHARLES WALLER, | |
| | |
| Defendant and Appellant. | |

Over a period of 15 years, defendant Roy Charles Waller broke into the homes of nine women, bound them, taped their eyes and mouths shut, demanded their money, and repeatedly sexually assaulted them.  Years after he attacked his last two victims, defendant was identified through DNA evidence.  A jury found defendant guilty of all 46 counts charged against him, which included 21 counts of forcible rape, one count of attempted forcible rape, 10 counts of forcible sexual penetration, four counts of forcible oral copulation, one count of forcible sodomy, eight counts of aggravated kidnapping for extortion, and one count of aggravated kidnapping for rape.  It also found true numerous enhancements.  The trial court sentenced defendant to 897 years to life in prison.

In his original briefing, defendant argued there was insufficient evidence to support a guilty verdict on five counts of kidnapping for purposes of extortion and 11 kidnapping enhancements.  He further challenged the imposition of various fines and

1

fees.  In a supplemental brief, defendant argued that he was entitled to resentencing under Senate Bill No. 567 (2021-2022 Reg. Sess.) (Senate Bill 567).  In our original unpublished opinion (*People v. Waller* (Sept. 30, 2022, C093431) [nonpub. opn.] (*Waller*)), we reduced count five to felony false imprisonment and imposed the lower term on that count.  We further modified the judgment in certain respects concerning fines, fees, and penalty assessments.  We declined to remand for resentencing pursuant to Senate Bill 567, finding any error was harmless.  In all other respects, we affirmed the judgment.

The California Supreme Court granted defendant's petition for review and subsequently transferred the matter back to us with directions to vacate our decision and reconsider the matter in light of *People v. Lynch* (2024) 16 Cal.5th 730 (*Lynch*).  Having done so, we cannot conclude that, following enactment of Senate Bill 567, the errors in imposing upper term sentences were harmless beyond a reasonable doubt.  Accordingly, we will again reduce count five to felony false imprisonment and we will vacate defendant's sentence and remand for a full resentencing.  Otherwise, we affirm the judgment.

FACTUAL HISTORY

A.    *N. Doe, Rohnert Park, 1991*

In 1991, N. Doe posted an advertisement for a roommate in the local newspaper. Defendant called N. Doe in response and expressed interest in the home.  N. Doe gave him the address.  In the evening several days later, N. Doe fell asleep alone on her couch. She was awoken by defendant in a ski mask pointing a gun at her head.  He crouched next to her with his arm around her back, told her to stay quiet, and said repeatedly, "I'm just here for your money, where's your money?"  N. Doe thought to herself, "[H]e's just here to rob me, I'll just do exactly what he tells me to do and do it as quickly as possible and then get him out of here."

2

N. Doe told defendant that her money was in her purse. Defendant said, "Tell me where your purse is. If it's upstairs, . . . we're going to go upstairs." N. Doe said that her purse was upstairs, so he led her upstairs from behind with his gun pointed at her head. Defendant guided her towards the master bedroom with the gun, laid her facedown on the bed, bound her hands behind her back with a plastic cord, and bound her feet. He repeated that he was there to get money.

Defendant put a cloth in N. Doe's mouth, duct-taped her eyes and mouth shut, and put a pillowcase over her head. Defendant began to rummage around her house. He went downstairs, turned the TV up, and brought a boombox into the master bedroom, turned on music, and continued to ask where the money was located. After going downstairs again, he returned and demanded to know where her cash and ATM card were. N. Doe was terrified. She viewed defendant as forcing her to tell him where to find her purse and ATM card. Defendant took the pillowcase off N. Doe's head and tried to get her to motion where the purse with the money and ATM card was located. He repeatedly asked for her PIN. N. Doe did not know her PIN, but she was able to peek beneath the tape on her eyes and see the paper that had her PIN written on it. She could also see the gun next to her on the bed. She gestured towards the paper with her head and defendant, realizing she could still see, put the pillowcase over her head again.

Approximately an hour and a half after he arrived in N. Doe's house, defendant flipped N. Doe over and, as she was shaking and crying, he said, "Don't worry, this isn't going to be as bad as you think." Then he raped her. N. Doe was terrified for her life. Defendant apologized and told N. Doe he had been watching her for weeks. N. Doe begged him to leave, but he said he would leave when he was "done." At some point he said, "We're gonna be here all night, cause I know you're gonna be here by yourself tomorrow."

Defendant threatened to shoot N. Doe three or four times throughout the night. He said, "If you tell anyone, I'll shoot you, I'll come back and kill you." Defendant went

3

downstairs again and rummaged through her things, which he had been doing throughout the course of the night and for "quite a bit of time." He returned to N. Doe's room and raped her two more times. Defendant then said that he had to go to the bank. He asked N. Doe where her bank was located, and she told him because he kept demanding it and because she hoped he would leave. Eventually, defendant retied her hands in front with duct tape, gave her a butter knife, and told her to wait three songs to give him time to go to the bank before she cut herself free. He told her that if she called the police, he would know and would come back to kill her before they arrived. He left, and N. Doe waited three songs before unbinding herself and calling her mother, who called the police.

Defendant was in N. Doe's home for hours. When he left, he took two leather jackets, several pairs of black underwear, a 35mm camera, N. Doe's ATM card, the paper with her PIN, and cash from her purse. The police later determined that her ATM card was used after the attack.

B.     *T. Doe, Vallejo, 1992*

T. Doe, who lived alone, placed an advertisement in the newspaper to find a roommate. One morning, T. Doe awoke to her phone ringing and heard someone trying the doorknob on her bedroom door, which was locked. She walked down the hallway and found defendant hiding behind the bathroom door. He wore a black ski mask and gloves and held a rusty knife. T. Doe ran back into her bedroom and defendant jumped on top of her. She screamed, struggled, and grabbed the knife, cutting her hand.

T. Doe broke free and ran towards the window to jump. However, she tripped, and defendant jumped on top of her. Defendant put his hand over her mouth for so long that she could not breathe. At some point T. Doe struck him with a lamp and pushed the broken blade from the knife into his face, cutting him above his right eyebrow.

Defendant repeatedly told T. Doe that he was there to rob her. He said, "I don't want to hurt you, I just want your money." Defendant duct-taped T. Doe's eyes and mouth shut. He bound her hands and feet as she lay face down on the floor, picked her

4

up, and put her on the bed. He tied her hands and ankles "spread-eagle" to the bedposts. Defendant cut off T. Doe's pajamas, fondled her, and raped her.

T. Doe asked him why he picked her, and defendant stated two or three times that he just came to get money. He went through T. Doe's purse, where her ATM card was located. Defendant got on top of T. Doe a second time. He commented on the heart pendant that she wore around her neck, removed the necklace, and raped her again. Thereafter, he walked around the house again, returned, and raped her a third time.

Defendant was in T. Doe's home from approximately 8:00 a.m. to 2:00 p.m. T. Doe struggled to loosen the ropes and escape every time he left the room but was unable to do so. When she could no longer hear defendant, she pulled hard on the ropes, freed herself, and called the police. After defendant left, T. Doe's heart pendant and a jug of coins were gone.

C. *R. Doe, Chico, 1997*

One evening, 21-year-old R. Doe returned home to her apartment after a night out with her sister. At 4:20 a.m., she awoke to defendant in a ski mask covering her mouth with his gloved hand, and holding a gun to her head. He said, "Shut the fuck up, I have a gun, I'll kill you." He said the gun was not fake.

Defendant told her he just wanted some "quick cash and then he would leave." He forced R. Doe onto her stomach and zip-tied her arms behind her back. He tied her legs spread-eagle to the bedposts. He put duct tape over her mouth and eyes. Defendant later removed the zip ties, turned her over, spread her arms and legs in an "X" shape, and tied her ankles and wrists to the bedposts with rope.

Defendant repeatedly left the room to rummage through her things. R. Doe tried, unsuccessfully, to free herself. Approximately 30 minutes to an hour after arriving, while R. Doe was still bound to the bed, defendant told R. Doe he wanted her ATM card and asked for its location. She said it was in her car, so he took her keys and went to the car. When he returned, he asked for her PIN, which R. Doe felt "force[d]" to disclose. She

5

gave him her PIN because she was afraid of him, as he had a gun and said he would kill her. However, the bank account connected to her ATM card and the PIN had been closed.

R. Doe got one arm free, and when defendant saw, he became angry and said, "I'm gonna have to tie you up tighter now, because you're trying to get free." Eventually, R. Doe got both arms free, removed the duct tape on her face, and grabbed a pair of scissors, demanding that defendant leave. Defendant charged at her and she stabbed defendant's arm with the scissors. Angry, defendant said, "You've really done it now, you're gonna get it." He tied her up again in the spread-eagle position and placed duct tape back on her face. When she held her knees together, he pinched her nose closed, saying he would let her breathe if she spread her legs. Defendant kneeled next to the bed and fondled R. Doe. He then got on top of R. Doe and rubbed his penis against her labia for 15 to 20 minutes multiple times. Defendant said he would stay all day. R. Doe was terrified.

Defendant left around 7:00 a.m. R. Doe freed herself and ran to her property manager's apartment, who called the police.

D. *K. Doe and Y. Doe, Sacramento, 2006*

A woman posted ads on Craigslist and social media in May 2006 seeking a "20-something year[] old" Asian female to rent a room in her Sacramento home. K. Doe was already renting one of the bedrooms. Y. Doe rented another room in the home beginning in approximately August 2006. One evening in October 2006, K. Doe was home alone. At approximately 12:30 a.m., she called Y. Doe to check on her, who said she was out at a restaurant. K. Doe hung up and showered. When she emerged from the bathroom, she saw defendant standing in front of her. K. Doe screamed, and defendant grabbed her, covered her mouth, and pointed a gun at her temple. He told her to be quiet, that he just wanted money, and that it would be over soon.

Defendant told her to get down on the floor, which she did because she was scared and wanted him to take the money and leave as soon as possible. As K. Doe lay on her stomach, defendant put tape over her eyes and mouth. He put her hands behind her back and wrapped tape around her hands and wrists. Defendant repeatedly asked her where her money was located. Because her mouth was taped shut, he asked her "yes" and "no" questions about the whereabouts of her money. K. Doe shook her head "no" until he stated her wallet's correct location—the dresser—and nodded, "yes." She disclosed where her money was located because she was afraid, defendant had a gun that he had pointed at her head, and told her he wanted money. At one point, while K. Doe was bound, facedown in the hallway, defendant asked for the PIN to her ATM card. Although defendant kept asking for the number, K. Doe could not communicate it because her mouth was taped shut. So, defendant recited numbers aloud while K. Doe nodded when each number was correct. However, K. Doe gave him the wrong PIN.

After about 30 minutes, defendant picked K. Doe up and moved her to the master bedroom. He placed her facedown on the floor of the bedroom for another 20 to 30 minutes, asking where her money could be found. When he saw she only had $50 in her wallet, he asked, "Where's the rest of the money?" She shook her head to communicate that there was no more money left. He continued to rummage around the house. Defendant also asked when her roommate would return, apparently aware that K. Doe had a roommate. He eventually moved K. Doe to the bed and duct-taped her ankles together.

At approximately 1:30 a.m., Y. Doe entered the house through the garage. Defendant jumped in front of her, covered her mouth with his hand, and pointed a gun at her temple. He told K. Doe not to "do anything stupid," that he just "want[ed] some money." Keeping his hand over her mouth, defendant pushed Y. Doe towards the master bedroom. As they walked, he told Y. Doe to drop her purse, which she did because she did not want to make him angry and hoped he would take the money and go. In the

7

master bedroom, Y. Doe saw K. Doe facedown and bound on the bed. Defendant told Y. Doe to get on the floor, where he duct-taped her mouth and eyes shut and taped her wrists together behind her back.

Defendant looked through Y. Doe's purse for her wallet. He pulled out a card and asked if it was her ATM card. Y. Doe shook her head "no." Then he took out another card and asked if it was her ATM card. She nodded "yes." He asked for her PIN. Defendant went number by number as Y. Doe, feeling very afraid, nodded in response to certain numbers. However, Y. Doe purposely did not give him the correct PIN because she did not want to give him her money, even though she felt she had to give him the numbers. Defendant also asked for the location of her money in the house. Y. Doe indicated towards the desk with her head. She felt she had to tell defendant because she was scared for her life and did not want to anger him. The money was gone from the desk after defendant left.

Defendant picked up Y. Doe, carried her to the closet, and sat her on a stool inside the closet. He repeatedly asked, "Where is the stash of money?" She shook her head "no" because she had no more money. He told her that he had a gun, the car he was driving was stolen, and he had nothing to lose. Defendant picked her up and moved her to the bed, placing her on her back next to K. Doe. Holding a gun to K. Doe's head, defendant orally copulated K. Doe's vagina and anus. He penetrated her vagina with his finger approximately 30 times, as he continued to ask where he could find her money. At times he would go rummage around the house, and return to penetrate K. Doe with his finger again.

Defendant turned to Y. Doe and raped her. He then went to other rooms in the house, opening drawers. Defendant returned and orally copulated Y. Doe, repeatedly putting his fingers in her vagina. He left again to rummage through drawers. He returned and raped Y. Doe a second time. He went back and forth between the two roommates, raping them a total of four times each.

After cutting off their clothes, defendant washed K. Doe and Y. Doe in separate bathtubs while putting his fingers in their vaginas. He carried each of them back to the bed and told them not to call the police. After he left, K. Doe and Y. Doe freed themselves.

Defendant took K. Doe's ATM card, credit card, business cards, a spare key, student ID, garage door opener, digital camera, and a pair of underwear. He took Y. Doe's driver's license, ATM card, $200 in cash, a photo of her, her clothing, a towel, and the bedsheet from her bed.

E. *Additional Victims*

Defendant assaulted four additional victims. We summarize these crimes briefly, as the details are not necessary to resolve this appeal.

In 1996, defendant entered S. Doe's home in Martinez, bound her, raped her four times, and penetrated her with a tool attached to a vacuum. Defendant stole pieces of S. Doe's undergarments that he cut off her, her ATM card, and cash. He used the PIN that S. Doe gave him to withdraw $300 from her bank account.

In 1997, defendant broke into T.H. Doe and K.H. Doe's Davis apartment through a window. He bound them, placed tape over their eyes and mouth, raped T.H. Doe twice, and penetrated her with a plastic object. He kissed K.H. Doe's body and rubbed his penis on her thigh. Defendant took K.H. Doe's ATM card, credit cards, keys, and checkbook. T.H. Doe's ATM card and her diamond ring were missing after defendant left. Using the PIN's he obtained during the assault, he withdrew $300 from K.H. Doe's bank account and $300 from T.H's Doe's bank account.

In 2000, defendant entered C. Doe's Davis home while she was home alone. He bound her and carried her to her car, where he raped and sodomized her in the backseat. C. Doe's wallet was missing after defendant left.

F.     *DNA Identification and Additional Evidence*

In 2018, law enforcement received information regarding defendant as a possible suspect. They obtained defendant's DNA and an analyst found that it was consistent with the DNA profile from the vaginal swabs taken in the Sacramento case. Police arrested defendant and their searches revealed numerous items that were consistent with his crimes. Defendant had a backpack containing a "tactical pen" with a "window punch," used for breaking windows, zip ties, packing tape, a flashlight, condoms, and a vehicle tracking device. He had two storage units, where police found five black zippered bags containing, among other things, ski masks, ropes, zip ties, baby oil, condoms, a pry bar, duct tape, a flashlight, a stun gun, handcuffs, razors, black gloves, women's underwear, and scissors. The storage units also contained locksmith equipment and instructions, printed advertisements for rooms for rent, maps, and e-mails from a single email account purporting to be various women inquiring about rentals, along with maps and floorplans. A search of defendant's home revealed approximately 10 guns and a computer, which contained several photographs of naked women bound to beds.

The police obtained a buccal swab from defendant. His DNA profile matched DNA taken from all of the crime scenes described above except the 1997 Davis crime scene pertaining to T.H. Doe and K.H. Doe.

## PROCEDURAL HISTORY

Following trial, the jury found defendant guilty of the following crimes against his nine victims: (1) three counts of rape (Pen. Code,[1] § 261, subd. (a)(2)) and one count of aggravated kidnapping for extortion (§ 209, subd. (a)) as to N. Doe; (2) three counts of rape, one count of aggravated kidnapping for extortion, and two counts of digital penetration (§ 289, subd. (a)) as to T. Doe; (3) four counts of rape, three counts of digital penetration, one count of aggravated kidnapping for extortion, and one count of oral

---

[1]     Undesignated statutory references are to the Penal Code.

10

copulation (former § 288a, subd. (c)) as to S. Doe; (4) two counts of rape, one count of digital penetration, and one count of aggravated kidnapping for extortion as to T.H. Doe; (5) one count of aggravated kidnapping for extortion as to K.H. Doe; (6) one count of kidnapping for extortion and one count of rape as to R. Doe; (7) one count of aggravated kidnapping to commit rape (§ 209, subd. (b)(1)), two counts of digital penetration, one count of rape, one count of sodomy (§ 286, subd. (c)(2)), and one count of oral copulation as to C. Doe; (8) three counts of rape, one count of attempted rape (§§ 664, 261, subd. (a)(2)), one count of oral copulation, one count of digital penetration, and one count of aggravated kidnapping for extortion as to K. Doe; and (9) four counts of rape, one count of oral copulation, one count of digital penetration, and one count of aggravated kidnapping for extortion as to Y. Doe. The jury further found true all special allegations, which included various enhancements for personal use of a firearm, use of a deadly and dangerous weapon (knife), committing crimes during a burglary, kidnapping victims, kidnapping victims to substantially increase the risk of harm, multiple victims, and tying or binding victims. The trial court judge deemed count thirty-six, attempted rape, with a personal use of a firearm enhancement as to K. Doe, the principal term, and sentenced defendant to an indeterminate term of 438 to life in prison plus a consecutive, determinate term of 459 years, for a total sentence of 897 years to life in prison. It also imposed various fines, fees, and victim restitution.

## DISCUSSION

### I

### *Kidnapping for Purposes of Extortion and Kidnapping Enhancements*

Defendant argues there was insufficient evidence to convict him of kidnapping for purposes of extortion as to victims N. Doe (count four); T. Doe (count five); R. Doe (count twenty-five), K. Doe (count thirty-nine); and Y. Doe (count forty-six). He further contends that the same evidentiary deficiencies apply to the section 667.61, subdivision

11

(e)(1), kidnapping enhancements, which correspond to K. Doe and Y. Doe.[2]  The People concede that there is insufficient evidence to support defendant's conviction on count five against T. Doe, and the parties agree we may reduce count five to felony false imprisonment.  The People otherwise aver that substantial evidence supports the jury's verdict on the other counts.  We consider defendant's arguments as to each victim in turn.

        A.     *Applicable Legal Principles*

Section 209, subdivision (a), defines aggravated kidnapping as holding or detaining, or intending to hold and detain, a person (1) for ransom; (2) for reward; (3) to commit extortion; or (4) to exact from another person any money or valuable thing.  Under the statute, the kidnapping victim may be the same person as the person who is being extorted.  (*People v. Stringer* (2019) 41 Cal.App.5th 974, 981-982.)

"[T]he crime of extortion is related to the offense of robbery; indeed, courts have sometimes found it difficult to distinguish these two offenses.  [Citations.]  The statutory definitions of robbery and extortion are structurally similar.  [Citation.]  Both offenses have their roots in common law larceny and both share a common element—acquisition by means of force or fear."  (*People v. Kozlowski* (2002) 96 Cal.App.4th 853, 866 (*Kozlowski*).)  However, the two crimes differ in several ways.  In an extortion, the property is taken with the victim's consent, while in a robbery, the property is taken against the victim's will.  (*Ibid.*)  Further, robbery requires "a specific intent to permanently deprive the victim of the property" and "requires the property be taken from the victim's 'person or immediate presence.'  (§ 211.)"  (*People v. Torres* (1995)

---

[2]     The aggravated kidnapping enhancements at issue apply to counts thirty-three through thirty-five, thirty-seven, and thirty-eight (K. Doe) and forty through forty-five (Y. Doe).  The jury relied on the same jury instruction, CALCRIM No. 1202, to determine whether defendant was guilty of kidnapping K. Doe and Y. Doe for extortion (counts thirty-nine and forty-six, respectively) and to assess the kidnapping enhancements.

33 Cal.App.4th 37, 50.)  Extortion, on the other hand, requires only "the specific intent of inducing the victim to consent to part with his or her property."  (*Ibid*.)

Per section 518, extortion is accomplished by obtaining the "property or other consideration from another."  (§ 518, subd. (a).)  Under this chapter, " 'consideration' " means "anything of value."  (*Id*., subd. (b).)  Further, courts have construed "property" broadly within the extortion context, finding that intangibles such as a PIN to access a bank account constitutes "property" within the meaning of the extortion statute.  (*Kozlowski, supra*, 96 Cal.App.4th at pp. 867-868; see also *People v. Fisher* (2013) 216 Cal.App.4th 212, 217-218 [the right for an employer to choose an employee can be extorted property]; *People v. Baker* (1978) 88 Cal.App.3d 115, 119 [right to file an administrative complaint is property for purposes of extortion].)

In reviewing a defendant's challenge to the sufficiency of the evidence, we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence.  Substantial evidence is evidence that is credible, reasonable, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)

We do not reassess the credibility of witnesses, and we draw all inferences from the evidence that supports the jury's verdict.  (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1382.)  If substantial evidence supports the verdict, we defer to the trier of fact and do not substitute our evaluation of witness credibility for that of the jury.  (*People v. Snow* (2003) 30 Cal.4th 43, 66.)  If the record supports the jury's findings, our belief that the circumstances might also reasonably support a contrary finding does not warrant a reversal of judgment.  (*People v. Abilez* (2007) 41 Cal.4th 472, 504.)

B.	*N. Doe (count four)*

Defendant contends insufficient evidence supports the jury's finding that defendant kidnapped N. Doe for purposes of extortion, because the evidence shows that defendant took N. Doe's ATM card and PIN *without* her consent, negating an essential

element of extortion.  In making this argument, defendant attempts to draw a distinction between consenting to give property to a perpetrator versus telling a perpetrator where property is located, insisting that the latter is not "consent."  Defendant argues that upholding defendant's conviction as extortion would impermissibly blur the line between robbery and extortion, permitting the prosecution to obtain a conviction for aggravated kidnapping in every case where the victim is detained and the robber asks, "Where is your money?"  We are not persuaded.

At the outset, we recognize that the line between robbery and extortion is not always well defined.  The two crimes can be difficult to distinguish from each other, in part because there is a legal paradox inherent in the definition of extortion that provides for a taking that is simultaneously consensual *and* the result of force or fear.  (*People v. Torres, supra*, 33 Cal.App.4th at p. 50, fn. 6; *People v. Peck* (1919) 43 Cal.App. 638, 643 (*Peck*).)  Consequently, there is sometimes a subtle distinction between taking property by force or fear consensually (extortion) versus taking property by force or fear against the victim's will (robbery).  While we acknowledge the distinction can be murky in certain cases, we conclude that in this case, a reasonable jury could find that N. Doe consented to give defendant her property when she disclosed to defendant its location.

The law of extortion generally treats the victim's compliance as consent.  Property is extorted when the victim consents to "surrender" his or her property under duress.  (*People v. Goodman* (1958) 159 Cal.App.2d 54, 61.)  A victim's consent may be coerced where the victim gives the perpetrator money but "protest[s] in his own heart against his money being taken for that purpose."  (*Peck, supra*, 43 Cal.App. at p. 645.)  Thus, a victim of extortion may "consensually" give money (or other property) to the extorter, but not with the "free consent or willingness that he would pay out money to satisfy an obligation or to subserve some charitable or useful public purpose."  (*Ibid*.)

Here, defendant broke into N. Doe's home, held a gun to her head, and asked where her money was located.  N. Doe decided to do exactly as defendant demanded, as

quickly as possible, in the hopes that he would take her money and leave. She told defendant the money was in her purse, and that her purse was upstairs. He guided her upstairs with his gun, covered her eyes and mouth with tape and her head with a pillowcase, bound her hands and feet, and demanded to know where her ATM card was located. He took the pillowcase off her head so she could motion to him the location, which she did. Defendant then demanded her PIN, and N. Doe, still bound, used her head to gesture towards the paper with the PIN on it. After raping the still-bound N. Doe three times, defendant asked where her bank was located, and she told him. Defendant left N. Doe's home, and her ATM card was used thereafter.

This evidence is sufficient to show that N. Doe consented, through force or fear, to give defendant her ATM card and PIN. In response to defendant's demand for her purse, N. Doe told defendant where her purse was located while defendant held her at gunpoint. When defendant was still unable to find N. Doe's ATM card in her purse, N. Doe—hands and feet tied, blinded, and vulnerable—indicated to defendant its precise location. She similarly gestured towards a paper on which her PIN was written, thereby surrendering both her ATM and PIN to defendant while under duress. As a result of N. Doe's consent, defendant obtained the ATM card and PIN and accessed N. Doe's bank account. Thus, substantial evidence supports the jury's finding that she was coerced by force or fear into surrendering her property. (See, e.g., *Peck, supra*, 43 Cal.App. at pp. 643-644 [extortion conviction upheld when the victim told the defendant where the victim's money was located out of fear the defendant would harm him].)

Defendant next argues that the verdict is unsupported because N. Doe did not give defendant her PIN and, in any event, her PIN lacked value because he did not take any money from her bank account. As an initial matter, defendant misrepresents the record. N. Doe testified that she gestured to the location of her ATM card and the paper with her PIN on it. Defendant took both, and her bank account was accessed after defendant fled.

15

Further, it is the access to N. Doe's bank account that the PIN provides, and not the amount of money taken, that leads us to categorize a PIN as property that may be extorted. "[T]he means to bank account access is an intangible benefit susceptible of possession. [Citation.] Thus, it may reasonably be said that a PIN code is property because it implies the right to use that access code—and to access the funds in the related bank account by means of that code." (*Kozlowski, supra*, 96 Cal.App.4th at p. 867.) As explained in *Kozlowski*, by extorting a PIN, the extorter deprives the victim of his or her exclusive right to access the bank account. (See *id*. at p. 869.) And here, defendant did not solely extort the PIN, but the ATM card as well, allowing defendant to get into N. Doe's bank account. Thus, both the ATM card and the PIN constitute property that defendant extorted. (*Ibid*.) As substantial evidence shows that defendant coerced N. Doe's ATM and PIN from N. Doe, substantial evidence supports the jury's finding that he intended to extort property from N. Doe. (See *People v. Kwok* (1998) 63 Cal.App.4th 1236, 1248-1252 [taking a door lock to make an unauthorized copy of a key was theft because it impaired the victim's right of exclusive possession and use of her home].)

### C. *R. Doe (count twenty-five)*

Defendant next contends that insufficient evidence supports the jury's finding that R. Doe consented to give defendant her ATM card and PIN. Again, we disagree.

The evidence of R. Doe's consent obtained through force or fear is similar to that of N. Doe's consent, and the jury's findings are supported for the same reasons. Defendant broke into R. Doe's house, held her at gunpoint, and threatened to kill her. He told her he would leave if she gave him some "quick cash." Defendant tied her spread-eagle to the bed, and duct-taped her eyes and mouth closed. After leaving her bound for approximately 30 minutes to an hour, defendant asked R. Doe, still tied up, where her ATM card was located. R. Doe told defendant it was in her car. Defendant obtained the card and asked for her PIN. R. Doe told defendant her PIN because she was afraid, as he

16

had a gun and threatened to kill her. This is sufficient evidence for a rational jury to conclude that defendant took her ATM and PIN, with her consent, through force or fear. Indeed, evidence of R. Doe's consent is particularly strong here, where her PIN was not a tangible object that defendant could forcibly take from her, as in a robbery, but rather something intangible that defendant could only extract from a consenting victim. (E.g., *People v. Fisher, supra*, 216 Cal.App.4th at pp. 216-219; *Kozlowski, supra*, 96 Cal.App.4th at pp. 865-869; *People v. Baker, supra*, 88 Cal.App.3d at p. 119.)

Nonetheless, defendant notes that R. Doe's bank account had been closed, and thus, he would have been unable to use the ATM card and PIN to access her account. He therefore insists that both the ATM card and PIN lack value and cannot constitute extorted property. However, defendant's argument fails to appreciate the language of section 209, which makes clear that it is only defendant's *intent* to extort property, and not his ultimate success, that is required under the statute.

Defendant was not convicted of extortion under section 518, which is defined as "the obtaining of property from another, with his or her consent, . . . induced by a wrongful use of force or fear . . . ." (§ 518, subd. (a).) Rather, defendant was convicted of kidnapping for extortion under section 209, subdivision (a). In relevant part, a person is guilty under the statute if he or she seizes, confines, or kidnaps a victim "*with intent* to hold or detain . . . that person . . . to commit extortion . . . ." (§ 209, subd. (a), italics added.) Thus, to be found guilty of aggravated kidnapping, a defendant needs only to have the *intent* to hold the victim to obtain the person's property through coerced consent. A defendant need not actually accomplish his or her purpose by ultimately obtaining property. (See also CALCRIM No. 1202 (§ 209, subd. (a)) ["Someone intends to commit extortion if he intends to: (1) obtain a person's property with the person's consent and (2) obtains the person's consent through the use of force or fear"], italics omitted.)

17

In this sense, kidnapping for purposes of extortion is comparable to an attempt to commit a crime. Like an attempted crime, "[t]he crime of kidnaping for [extortion] is complete when the kidnaping is done for the specific purpose of obtaining [property or consideration] even though the purpose is not accomplished. To define kidnaping for [extortion] otherwise would overlook the underlying gravity of the offense with an unwarranted emphasis on the success of the criminal activity." (*People v. Anderson* (1979) 97 Cal.App.3d 419, 425 [discussing § 209, subd. (a), in the related context of kidnapping for ransom].) Indeed, as our Supreme Court has explained, " '[i]t is the means employed [to obtain the property of another] which the [extortion] law denounces.' " (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 326-327.) Thus, even if we were to conclude that R. Doe's ATM card and PIN did not constitute "property" for purposes of extortion because they do not connect to an open account, a reasonable jury could still find that, by obtaining R. Doe's ATM card and PIN and repeatedly demanding money, defendant kidnapped R. Doe for the *purpose* of obtaining property: a functioning ATM card and PIN that provided access to an open account.

Further, we are not persuaded that an ATM card and PIN cannot be extorted simply because they are linked to a closed account. When considering the value of an ATM card and PIN connected to a closed account, we may look to robbery and larceny offenses for guidance, "because the crime of extortion is related to the offense of robbery." (*Kozlowski, supra*, 96 Cal.App.4th at p. 866.) In the context of robbery, "the lack of value of the asported matter cannot efface the crime." (*People v. Graham* (1969) 71 Cal.2d 303, 326-327 [sufficient evidence of robbery where the perpetrator ripped off the victim's empty pants pocket].) As our Supreme Court has explained, a defendant who takes a wallet through force or fear is guilty of robbery even if the defendant, "after finding [the wallet] to be empty, casts it aside." (*Id*. at p. 327.) And, the definition of "property" is defined more narrowly in the context of robbery than the extortion context. (*Kozlowski*, at p. 866.) Thus, we can reasonably conclude that even if the ATM card and

18

PIN were worthless beyond the value of the card's plastic, they still constitute property, like the empty wallet, which may be extorted. This is supported by the rationale in *Kozlowski*, which did not rely on the amount of money in the bank account to conclude that a PIN constitutes property under section 209, subdivision (a). Indeed, *Kozlowski* held that a PIN is property for purposes of extortion, despite the fact that there was no money in the account linked to one of the victim's ATM cards. (*Kozlowski*, at p. 858.)

Thus, as the ATM card and PIN constitute property, and because there is evidence in the record that defendant obtained the ATM card and PIN through coerced consent, substantial evidence supports the finding that defendant intended to extort property from R. Doe.

D. *K. Doe (count thirty-nine) and Corresponding Penalty Provisions (counts thirty-three through thirty-five, thirty-seven, and thirty-eight)*

With respect to K. Doe, defendant again argues that there is insufficient evidence to show she consented to give her property to defendant, and that defendant extorted nothing of value, because there is no evidence defendant used the ATM card and PIN to extract money from her account. Defendant further argues, for the first time on reply, that the PIN provided by K. Doe was not an item of value because it was an incorrect number that did not provide access to her bank account.[3] We conclude substantial evidence supports the verdict.

First, substantial evidence supports the jury's finding that K. Doe consented to give defendant her ATM card out of force or fear. As with defendant's other victims, he broke into K. Doe's house and held her at gunpoint. Defendant duct-taped her eyes,

---

[3]    While we typically decline to address arguments made for the first time on reply to prevent unfairness to the other party (*People v. Tully* (2012) 54 Cal.4th 952, 1075), it is the People who first raise this issue and address it in their responsive brief. Thus, we will consider the merits of defendant's argument, as the People are not prejudiced by us doing so.

19

mouth, and wrists, and repeatedly asked for her money, telling her he just wanted her money, and it would be over soon. Defendant asked where her money was located and, because she was bound and her mouth was taped shut, K. Doe shook her head "no" until he stated her wallet's location—the dresser—and then nodded "yes." She told him where her wallet was because she was afraid, and defendant had pointed a gun at her head, demanding money. Defendant removed her ATM card and asked for her PIN. K. Doe nodded along to the numbers he recited to give him a PIN, but she purposely gave him the incorrect number. Thus, there was sufficient evidence for a rational jury to conclude that K. Doe, fearful for her life, consented to give defendant her ATM card.

And as discussed *ante*, it is irrelevant that defendant was unable to use the ATM card to access K. Doe's account. The ATM card, by itself, constitutes tangible property. Moreover, defendant consistently insisted he was only in K. Doe's home for money. He demanded both K. Doe's ATM card and PIN, and he obtained her ATM card and extracted a false PIN through consent induced by force or fear. Based on this evidence, a reasonable jury could also conclude that defendant detained her with the *intent* to extort her PIN, which is all that section 209 requires.

E.     *Y. Doe (count forty-six) and Corresponding Penalty Provisions (counts forty through forty-five)*

Again, defendant challenges whether there was sufficient evidence that Y. Doe consented to give defendant property. And again, we conclude that substantial evidence supports the jury's verdict that defendant kidnapped Y. Doe for purposes of extortion. As Y. Doe came home, defendant jumped in front of her, held a gun to her head, and said, "Don't do anything stupid, I just want some money." While he pushed her towards the bedroom, he demanded she drop her purse, which she did because she did not want to make him angry. Defendant bound Y. Doe in the same manner as K. Doe and found a bank card in her purse. He asked Y. Doe if it was her ATM card, and she shook her head "no" until defendant pulled out her ATM card, at which time she nodded "yes." As he

20

did with K. Doe, defendant asked Y. Doe for her PIN and, because she had tape over her mouth, she nodded when defendant stated the correct number.  However, Y. Doe also purposely gave him the wrong PIN.  Defendant asked where her money was located, and Y. Doe, hands bound behind her back, gestured towards the desk with her head.  After he left, $200 was gone from her desk.

This evidence is sufficient for a rational jury to find that Y. Doe consented to give defendant her money and ATM card under duress.  It is also sufficient for a rational jury to find that defendant intended to extort Y. Doe's PIN.

F.      *T. Doe (count five)*

Defendant argues, and the People concede, that there is insufficient evidence to support the jury's finding that he took any of T. Doe's property with her consent.  We agree with the parties, as the evidence shows only that defendant took T. Doe's heart pendant and a jar of coins, but there is no evidence that he did so with T. Doe's consent.  Thus, the jury's finding that defendant kidnapped T. Doe for extortion is not supported by substantial evidence.

In view of this, the People argue that we should reduce count five to the lesser included offense of felony false imprisonment.  Defendant agrees that we have the authority to do so, but contends that if we do reduce his conviction, we should remand for resentencing.  The People argue that because defendant was sentenced to multiple indeterminate terms on other counts, resentencing is not required.

When a verdict or finding is contrary to law or evidence, but the evidence shows the defendant to be guilty of a lesser included offense of the crime charged, we may modify the judgment to reduce the verdict to the lesser offense where the prosecution prefers this approach, rather than retrying the greater offense.  (§ 1260; *People v. Kelly* (1992) 1 Cal.4th 495, 528.)  Felony false imprisonment is a lesser included offense of kidnapping for extortion.  (*People v. Eid* (2014) 59 Cal.4th 650, 657.)

21

Here, consistent with the parties' concessions, we find it appropriate to reduce defendant's kidnapping for extortion conviction on count five to felony false imprisonment. "[T]he essential element of false imprisonment is restraint of the person. Any exercise of express or implied force which compels another person to remain where he does not wish to remain, or to go where he does not wish to go, is false imprisonment. [Citation.] False imprisonment is a felony if it is effected by violence or menace. (§ 237.)" (*People v. Bamba* (1997) 58 Cal.App.4th 1113, 1123.) In accordance with these principles, to find a defendant guilty of felony false imprisonment, a jury must find that "the defendant intentionally restrained, or confined, or detained someone by violence or menace," and the "defendant made the other person stay or go somewhere against that person's will." (CALCRIM No. 1240.) In this context, "menace" "means a verbal or physical threat of harm, including the use of a deadly weapon." (*Ibid*.) "The threat of harm may be express or implied." (*Ibid*.)

By finding defendant guilty of kidnapping T. Doe for purposes of extortion, the jury necessarily found that defendant "kidnapped, abducted, seized, confined, or carried away" T. Doe with the intent to "hold or detain" her. (CALCRIM No. 1202.) This finding is supported by substantial evidence, as defendant jumped on top of T. Doe with a knife, placing his hand over her face until she could not breathe. He then tied T. Doe to the bed for six hours and raped her repeatedly. Although she frequently struggled to loosen the ropes and escape, she was tightly bound and could not break free until defendant left. Further, defendant's use of a knife, physical attack, smothering T. Doe until she was unable to breathe, and repeated sexual assaults, constitute substantial evidence that defendant restrained T. Doe through violence or menace. We accordingly modify the judgment to reduce count five to felony false imprisonment.

With respect to the sentence imposed, in part II of the Discussion, we shall determine that the matter must be remanded for a full resentencing. Therefore, we need

22

not address the parties' contentions concerning the sentencing consequences of our reduction of this count to felony false imprisonment.

## II

### Senate Bill 567

A. *Additional Background*

In sentencing defendant, with regard to circumstances in aggravation, the trial court stated as follows:

"The following circumstances in aggravation apply in this case: Rule [4] 4.421(a)(1), the crime involved great violence, great bodily harm, threat of great bodily harm or other act, disclosing a high degree of cruelty, viciousness, or callousness; (a)(2), the Defendant was armed with or used a weapon at the time of the commission of the crime; (a)(3), the victims were particularly vulnerable, as they were in their own homes when the crimes were committed; (a)(8), the manner in which the crimes were committed indicate planning, sophistication and professionalism; and (b)(1), the Defendant has engaged in violent conduct, that indicates a serious danger to society.

"In addition, pursuant to Rule 4.421(c), by statute, that the Defendant tied and bound several of the victims during the sexual assault, . . . Section 1170.84 requires those factors be considered as aggravation.

"In addition–Rule 4.421 and 4.408 also allow the Court to consider . . . any other factor in aggravation that reasonably relates to the Defendant or the circumstances. As such, the Court will also consider, as an aggravating factor, the Defendant's blatantly false testimony while under oath at trial.

"The Court emphasizes that it is not finding a perjury enhancement simply because the Defendant testified at trial and was convicted. Rather, the Court is

---

**4** References to rules are to the California Rules of Court.

specifically finding that during his testimony at trial, the Defendant made a willful statement under oath, of material matters which he knew to be false.

[¶] . . . [¶]

"As a general matter, the Court notes that if it has improperly considered the Defendant's trial testimony or any of the other factors just discussed, as an aggravating factor, the existence of even one of these aggravating factors would justify the sentence that will be imposed in this case.

"The only mitigating factor is the fact that the Defendant has a minimal criminal record.

[¶] . . . [¶]

"For all of the determinate term sexual offense convictions and the attempted rape conviction in Count 36, the upper term is being imposed, because each crime involved great violence and bodily harm, the use of a weapon, a vulnerable victim and the manner in which the crime was carried out indicated planning and sophistication and the Defendant engaged in violent conduct that indicates a serious danger to society.

"The Court also finds that any of these aggravating factors and/or any of the other aggravating factors already set forth in the record would, standing alone, be sufficient to justify the upper term for all of these convictions.

"For all of the weapons enhancements with a triad, the upper term is being imposed, because the crime involved great violence and bodily harm, the victim was particularly vulnerable, the manner in which the crime was carried out indicated planning and sophistication and the Defendant engaged in violent conduct that indicates a serious danger to society.

"Again, the Court finds that any of these aggravating factors and/or any of the additional aggravating factors already set forth in the record, with the exception of the use of a weapon, would, standing alone, be . . . sufficient to justify the upper term for all of the weapons enhancements.

[¶] . . . [¶]

"In total, the Defendant . . . is sentenced to state prison for a term of 459 years, to run consecutive to another term of 438 years to life."

After breaking down its sentence by count, the trial court continued:

"The Court notes, for the record, that if the Legislature amends any of the applicable sentencing statutes during the pendency of this appeal, such that the Court is given sentencing discretion over provisions which are currently mandatory, the Court would, nevertheless, still exercise its discretion to impose either the same sentence or the maximum sentence allowed.

"Likewise, to the extent that the Court has misconstrued any of the applicable mandatory sentencing provisions, such that it has discretion as to whether or not to follow those provisions, the Court would still exercise its discretion to impose either the same sentence or the maximum sentence allowed."

B.      *Procedural Background and the Parties' Contentions*

In a prior supplemental brief, defendant argued that his sentence should be vacated and the matter remanded for resentencing in light of Senate Bill 567's amendments to section 1170, subdivision (b).  In our original opinion, we concluded that resentencing was not required because, following enactment of Senate Bill 567, any error in sentencing was harmless.  (*Waller*, *supra*, C093431.)  The California Supreme Court granted defendant's petition for review and transferred the matter back to us with directions to vacate our decision and reconsider the matter in light of *Lynch*, *supra*, 16 Cal.5th 730.  By separate order, we vacated our prior decision.

In supplemental briefing following transfer, defendant argues he is entitled to remand for a full resentencing.  According to defendant, the trial court erred and violated his Sixth Amendment rights by, among other things, imposing upper term sentences based on vague and subjective aggravating circumstances that were not admitted by him and were not found true by the jury.  Defendant acknowledges that two circumstances in

25

aggravation were found true by the jury, specifically the use of a weapon during the commission of a crime (rule 4.421(a)(2)) and that he tied or bound victims (see §§ 667.61, subd. (e)(5), 1170.84).  However, he emphasizes that the other five circumstances in aggravation were not submitted to the jury.  Defendant argues that remand is required because the errors cannot be deemed harmless under the test for prejudice prescribed by the California Supreme Court in *Lynch*.

Defendant also argues that the trial court erred in failing to apply amended section 1385 in sentencing him.  However, supplemental briefing on transfer generally is limited to matters arising after our previous decision in the cause.  (Rule 8.200(b)(2).)  The amendment of section 1385 on which defendant relies became effective on January 1, 2022 (Stats. 2021, ch. 721, § 1), approximately nine months *before* our previous decision in this case, filed September 30, 2022, (*Waller*, *supra*, C093431).  Thus, this contention is not a proper subject of defendant's supplemental briefing on transfer.  (Rule 8.200(b)(2).)

In response to defendant's Senate Bill 567 arguments, the People argue that the trial court's noncompliance with section 1170, subdivision (b), as amended by Senate Bill 567, was harmless beyond a reasonable doubt.  Further, according to the People, the record clearly establishes that the trial court would impose the same sentence on remand.

Because we are unable to conclude that the errors were harmless beyond a reasonable doubt, we will remand for a full resentencing.

C.      *Senate Bill 567, section 1170, and* Lynch

Subdivision (b) of section 1170, as amended by Senate Bill 567, provides that the trial court "may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term and the facts underlying those circumstances have been stipulated to by the defendant or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial."  (§ 1170, subd. (b)(2).)

In *Lynch*, *supra*, 16 Cal.5th 730, the California Supreme Court concluded that, under section 1170, subdivision (b), "a Sixth Amendment violation occurs when the trial court relies on unproven aggravating facts to impose an upper term sentence, even if some other aggravating facts relied on have been properly established. The violation is prejudicial unless an appellate court can conclude beyond a reasonable doubt that a jury would have found true all of the aggravating facts relied upon by the trial court to justify an upper term sentence, or that those facts were otherwise proved true in compliance with the current statutory requirements. If the reviewing court cannot so determine, applying the *Chapman* [*v. California* (1967) 386 U.S. 18] standard of review, the defendant is entitled to a remand for resentencing." (*Lynch*, at p. 768.)

The California Supreme Court in *Lynch* cautioned that a "prejudice analysis following a change in the law respecting proof of aggravating circumstances 'can be problematic. The reviewing court cannot assume that the record reflects all of the evidence that would have been presented to the jury, or that the defendant had the same incentive and opportunity at a sentencing hearing to contest the aggravating circumstance. [Citation.] . . . "[T]o the extent a potential aggravating circumstance at issue in a particular case rests on a somewhat vague or subjective standard, it may be difficult for a reviewing court to conclude with confidence that, had the issue been submitted to the jury, the jury would have assessed the facts in the same manner as did the trial court." [Citation.] . . . "Many of the aggravating circumstances described in the rules require an imprecise quantitative or comparative evaluation of the facts," ' with the victim's particular vulnerability being one example." (*Lynch*, *supra*, 16 Cal.5th at pp. 775-776.)

The California Supreme Court also clarified how reviewing courts must proceed where, as here, a defendant's sentencing occurred before Senate Bill 567's amendments to section 1170, and therefore the sentencing court was not aware of the full scope of its discretionary authority. In such cases, " 'the appropriate remedy is to remand for

27

resentencing unless the record "clearly indicate[s]" that the trial court would have reached the same conclusion "even if it had been aware" ' " of the full scope of its sentencing discretion. (*Lynch*, *supra*, 16 Cal.5th at p. 771, quoting *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.) The Supreme Court approved of Court of Appeal case authority holding that the *Gutierrez* "standard for reversal . . . applies and must be satisfied *in addition to* a finding of harmlessness regarding any omitted factual finding" because "neither a *Chapman* nor a *Watson* review 'can adequately indicate that resentencing is *unnecessary* upon retroactive application of amended section 1170[, subdivision ](b).' " (*Lynch,* at p. 772; see *id*. at p. 773.)

D.      *The Circumstances in Aggravation*

As defendant acknowledges, two of the circumstances in aggravation were found true by the jury beyond a reasonable doubt. These were that defendant used a weapon at the time of the commission of his crimes (rule 4.421(a)(2)), and that he tied or bound victims (see §§ 667.61, subd. (e)(5), 1170.84). As for the remaining circumstances in aggravation on which the trial court relied, it is undisputed that these were neither admitted by defendant nor found true by the jury beyond a reasonable doubt. The trial court's reliance on these unproven aggravating circumstances to impose upper term sentences resulted in a Sixth Amendment violation, even though other circumstances in aggravation were properly established. (*Lynch*, *supra*, 16 Cal.5th at p. 768.) Therefore, we must assess prejudice by determining whether, applying *Chapman*, we "can conclude beyond a reasonable doubt that a jury would have found true *all of the aggravating facts relied upon by the trial court to justify an upper term sentence . . . .*" (*Ibid*., italics added.) If we cannot, defendant is entitled to a remand for a full resentencing. (*Ibid*.)

With regard to the circumstances in aggravation not found true by the jury, the trial court relied on the following: the "crime involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness" (rule 4.421(a)(1)); the victims were particularly vulnerable (rule

28

4.421(a)(3)); the manner in which the crimes were committed indicated planning, sophistication and professionalism (rule 4.421(a)(8)); and defendant "has engaged in violent conduct that indicates a serious danger to society" (rule 4.421(b)(1)). The court also relied on the fact that defendant offered "blatantly false testimony" during his testimony at trial, but, for present purposes, we will focus on the four circumstances in aggravation enumerated above.

These four circumstances in aggravation are, perhaps uniformly, "somewhat vague or subjective" and susceptible to imprecision. (*Lynch*, *supra*, 16 Cal.5th at p. 775.) Whether defendant's crimes "involved *great* violence, *great* bodily harm, threat of *great* bodily harm, or other acts disclosing *a high degree* of cruelty, viciousness, or callousness" calls, at least in part, for a subjective determination or application of a vague standard. (Rule 4.421(a)(1), italics added.) The California Supreme Court specifically identified the determination whether a victim was *particularly* vulnerable (rule 4.421(a)(3)) as being an example of an aggravating circumstance calling for " ' "an imprecise quantitative or comparative evaluation of the facts . . . ." ' " (*Lynch*, at pp. 775-776.) And whether the manner in which defendant committed his crimes indicated planning, *sophistication and professionalism* (rule 4.421(a)(8)), and whether he "engaged in violent conduct that indicates a *serious* danger to society" (rule 4.421(b)(1), italics added) both " ' "rest[] on . . . somewhat vague or subjective standard[s]" ' " and/or call for " ' "an imprecise quantitative or comparative evaluation of the facts . . . ." ' " (*Lynch*, at pp. 775-776.)

We note that in *Lynch*, the California Supreme Court concluded: "[e]ven under the less rigorous *Watson* standard, the Court of Appeal held that the omission of a jury trial on facts underlying three of the aggravating circumstances was prejudicial: the crimes involved a *high degree* of cruelty, viciousness, and callousness; the victim was *particularly* vulnerable; and Lynch poses a *serious* danger to society. Applying the more rigorous *Chapman* standard, we likewise find prejudice." (*Lynch*, *supra*, 16 Cal.5th at

29

p. 776.) There were additional considerations at issue in *Lynch* that are not present here, including that the jury had acquitted the defendant of the most serious charge against the victim. (*Ibid.*) However, the California Supreme Court emphasized the vague and subjective standards necessarily employed in the assessment of the facts when considering three of these four circumstances in aggravation. (*Id*. at pp. 775-776.)

Defendant committed numerous heinous crimes against several victims over many years. In this particular case, it may seem difficult to imagine a jury finding that these circumstances in aggravation were not proved true beyond a reasonable doubt. In fact, the People argue that, "if ever there was a case where it can be said beyond a reasonable doubt that the jury would have found the aggravating factors true, this is the case." However, the fact is that, in considering the vague and subjective standards involved, we necessarily would be engaging in some degree of speculation if we tried to divine what a jury might decide, beyond a reasonable doubt, as to each of these circumstances in aggravation. And we must adhere to the California Supreme Court's admonition that a prejudice analysis such as this may be " 'problematic,' " and it may be difficult to " ' "conclude with confidence" ' " that the jury would have found that certain circumstances in aggravation had been proven beyond a reasonable doubt. (*Lynch*, *supra*, 16 Cal.5th at p. 775.) Moreover, given that a finding that the errors were harmless requires us to conclude that "a jury would have found true *all of the aggravating facts relied upon by the trial court*" (*id.* at p. 768, italics added), the number of problematic circumstance in aggravation involving vague and subjective standards here compounds the difficulty in attempting to reach a reasoned determination as to what a jury would find beyond a reasonable doubt.

In light of *Lynch*, we cannot conclude that the error in relying on these circumstances in aggravation was harmless beyond a reasonable doubt. Because we cannot conclude, beyond a reasonable doubt, that the jury applying the beyond a reasonable doubt standard would have found true every one of these circumstances in

30

aggravation, we need not reach the second step in the test for prejudice, whether the record " ' "clearly indicate[s]" ' " that the trial court would have reached the same conclusion " ' "even if it had been aware" ' " of the full scope of its sentencing discretion. (*Lynch*, *supra*, 16 Cal.5th at p. 771, quoting *People v. Gutierrez*, *supra*, 58 Cal.4th at p. 1391.) We will vacate defendant's sentence and remand the matter for a full resentencing. (*Lynch*, at p. 776.)

## III

### *Additional Sentencing Claims*

In their original briefing, the parties raised additional claims concerning sentencing. Defendant argued that a $544.27 fee imposed under Government Code former section 29550.2 must be stricken given the passage of Assembly Bill No. 1869 (2019-2020 Reg. Sess.), and the People conceded the issue. Defendant further argued, relying primarily on *People v. Dueñas* (2019) 30 Cal.App.5th 1157, that the trial court violated his right to due process, equal protection, and the federal and state constitutional prohibitions against excessive fines by imposing fines, fees, and assessments without holding a hearing to determine his ability to pay. Lastly, in their respondent's brief, the People argued that the trial judge was required to impose $510 in penalty assessments on defendant's $300 section 290.3 sex offender fine. We addressed these arguments in our original, now vacated opinion. (*Waller*, *supra*, C093431.) Because we are vacating defendant's sentence and remanding for a full resentencing, these contentions are rendered moot. The parties will have the opportunity to raise any relevant arguments at resentencing.

## DISPOSITION

We modify the judgment to reduce count five to felony false imprisonment. (§ 236.)  We vacate defendant's sentence and remand the matter for a full resentencing. The judgment is otherwise affirmed.

_____\s\_____,
Krause, J.

We concur:

_____\s\_____,
Robie, Acting P. J.

_____\s\_____,
Duarte, J.